# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| RICHARD LETSON, KARA MURRAY-VOLPI, and RICHARD REED, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>      v.<br><br>FORD MOTOR COMPANY, a Delaware Limited Liability Company,<br><br>                Defendant. | Case No.<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CLASS ACTION COMPLAINT</u>

## TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................... 1

II.   JURISDICTION ..................................................................................... 7

III.  VENUE ................................................................................................... 8

IV.   PARTIES ................................................................................................ 8

    A.    Plaintiffs ...................................................................................... 8

        1.    Richard Letson (Massachusetts) ..................................... 8

        2.    Kara Murray-Volpi (New York) ..................................... 10

        3.    Richard Reed (West Virginia) ........................................ 11

    B.    Defendant .................................................................................... 12

V.    FACTUAL ALLEGATIONS ................................................................... 14

    A.    Ford marketed the Fire Risk Vehicles as safe and
        reliable, and Ford knew that these attributes were
        material to consumers ................................................................. 14

    B.    Plaintiffs and Class members paid thousands of dollars
        for the Fire Risk Vehicles because they thought the
        vehicles were safe and reliable. .................................................. 21

    C.    Ford's Vehicle Warranties ......................................................... 22

    D.    The Spontaneous Fire Risk ........................................................ 23

    E.    Ford knew or should have known of the Spontaneous
        Fire Risk before it disclosed the risk to Plaintiffs. ................... 26

        1.    Ford's durability testing should have uncovered
            the Spontaneous Fire Risk. ............................................. 27

        2.    Ford knew about the Spontaneous Fire Risk from
            warranty claims for Fire Risk Vehicles and its own
            investigation. ................................................................... 28

     F.     Class members could have been made aware of the Spontaneous Fire Risk at the point of sale. ........................................ 31

VI.    TOLLING OF THE STATUTE OF LIMITATIONS ................................. 32

     A.     Discovery Rule Tolling ..................................................................... 32

     B.     Estoppel ........................................................................................... 33

VII.   CLASS ALLEGATIONS ............................................................................ 33

VIII.  CLAIMS ....................................................................................................... 38

     A.     Nationwide Claims ............................................................................ 38

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *et seq.*) ........................................... 38

COUNT II FRAUDULENT CONCEALMENT (COMMON LAW) .................... 43

COUNT III UNJUST ENRICHMENT (COMMON LAW) ................................. 47

     B.     State-Specific Claims ........................................................................ 49

          1.    Massachusetts ...................................................................... 49

COUNT IV BREACH OF MASSACHUSETTS'S IMPLIED WARRANTY OF MERCHANTABILITY  (Mass. Gen. Laws Ann. Ch. 106, § 2-314) ....................................................................... 49

          2.    New York .............................................................................. 52

COUNT V VIOLATION OF NEW YORK'S DECEPTIVE ACTS AND PRACTICES (N.Y. Gen. Bus. Law § 349, *et seq.*) ........................... 52

COUNT VI VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT (N.Y. Gen. Bus. Law § 350) ................................... 56

COUNT VII BREACH OF NEW YORK'S IMPLIED WARRANTY OF MERCHANTABILITY (N.Y. U.C.C. Law §§ 2-314; 2A-212) .............................................................................................................. 58

          3.    West Virginia ....................................................................... 61

COUNT VIII VIOLATION OF WEST VIRGINIA'S GENERAL
     CONSUMER PROTECTION ACT (W. Va. Code Ann. § 46A-
     6-101, *et seq.*) ............................................................................. 61

COUNT IX BREACH OF WEST VIRGINIA'S IMPLIED
     WARRANTY OF MERCHANTABILITY (W. Va. Code Ann.
     § 46-2-314) ................................................................................... 66

REQUEST FOR RELIEF .................................................................... 68

DEMAND FOR JURY TRIAL ........................................................... 69

011148-11/2184574 V1

Plaintiffs file this lawsuit individually and on behalf of proposed nationwide and statewide Classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.    INTRODUCTION

1.    The most important duty of a car manufacturer is to provide consumers with a safe car. A second duty is to tell consumers the complete truth about any issues that may impact the safety of a car at the point of sale. A third and related duty is to promptly warn consumers and fix or replace a car where the manufacturer learns of an issue that implicates serious safety concerns. Finally, when a car manufacturer recalls a vehicle to institute a fix, the fix should address the risk involved and should not create new safety or environmental problems.

2.    Ford Motor Company ("Ford") breached these fundamental duties by selling Ford Escapes and Ford Bronco Sports equipped with fuel injectors that are prone to cracking, presenting a serious fire risk. Then, though Ford knew or should have known of the fire risk prior to launching the vehicles, it did nothing to promptly warn owners and lessees, instead waiting over a year to announce a safety recall. And while Ford now is implementing a "fix" to prevent these vehicles from catching on fire, it has chosen not to design or issue a *bona fide* fix that addresses the underlying problem that is causing the fuel injectors to crack.

- 1 -

Instead, Ford has focused only on mitigating the risk that fuel that leaks from a cracked fuel injector will accumulate near the exhaust and turbo system where it may combust, while leaving the fuel itself to run onto the roadways, or onto vehicle owners' driveways and garages. What is more, Ford's perfunctory "fix" creates new safety and environmental issues that Ford has not addressed.

3.      Model Year 2020–2023 Ford Escapes and 2021–2023 Ford Bronco Sports with 1.5L engines (the "Fire Risk Vehicles") are equipped with fuel injectors that are prone to cracking. Cracked fuel injectors in the engine allows for fuel to leak at a rate as high as 19 liters per hour into the cylinder head, which can travel out via a drain hole and down onto the exhaust and turbo system, resulting in under hood fires (the "Spontaneous Fire Risk").

4.      The Spontaneous Fire Risk exposes putative class members to an unreasonable risk of accident, injury, death, or property damage if their vehicle leaks such fuel and vapors or catches fire while in operation. The Spontaneous Fire Risk also exposes passengers, other drivers on the road, and other bystanders to an unreasonable risk of accident, injury, death, and property damage.

5.      This fire risk was known or should have been known to Ford and is still unremedied by Ford. Not only did Ford fail to disclose the Spontaneous Fire Risk to consumers both before and after their purchases of Fire Risk Vehicles, but it also misrepresented the vehicles' safety, reliability, functionality, and quality by

- 2 -

this omission. Ford also omitted the consequences, including the serious safety hazards and monetary harm caused by the Spontaneous Fire Risk—e.g., damage to a vehicle and injury or death to persons in the vehicle or another vehicle in proximity should the Fire Risk Vehicle catch on fire and/or damage to property from fuel and vapors leaking onto roadways and driveways, and into garages.

6.      Reports relating to the Spontaneous Fire Risk were made to Ford as early as September 9, 2020.[1] Yet Ford continued to sell the Fire Risk Vehicles and did nothing to warn purchasers of the Spontaneous Fire Risk until it issued a recall on March 25, 2022.[2] But even that recall, Ford now admits, was insufficient: it dealt with damaged oil separators only, and it did not address any problems with fuel injectors that are prone to cracking.[3] It was not until ten more fires occurred in Fire Risk Vehicles—after those vehicles had passed inspection for their oil separators—that Ford Engineering examined the Fire Risk Vehicles' fuel injectors and concluded that cracks in those injectors were leading to under-hood fires in the

---

[1] **Exhibit 1**, Ford Motor Company, Certain 2020-2023 Ford Escape and Bronco Sport – Under Hood Fire (Nov. 18, 2022) https://static.nhtsa.gov/odi/rcl/2022/RMISC-22V859-6041.pdf.
[2] **Exhibit 2**, NHTSA Part 573 Safety Recall Report 22V-191 (Mar. 25, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V191-3103.PDF.
[3] **Exhibit 1**, Ford Motor Company, Certain 2020-2023 Ford Escape and Bronco Sport – Under Hood Fire (Nov. 18, 2022) https://static.nhtsa.gov/odi/rcl/2022/RMISC-22V859-6041.pdf; *see also* **Exhibit 2**, NHTSA Part 573 Safety Recall Report 22V-191 (Mar. 25, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V191-3103.PDF.

- 3 -

Fire Risk Vehicles.[4] Ford's recall pertaining to the cracked fuel injectors was not issued until November 18, 2022.[5]

7.      To date, Ford has admitted that there have been at least 54 reports of under-hood fires[6] in a vehicle population of 521,778.[7] Of these fires, 17 have been confirmed as likely the result of a cracked fuel injector,[8] and at least two of these fires resulted in injuries.[9] Ford estimates that one percent of all Fire Risk Vehicles have the fuel injector defect.[10] This equates to over 5,000 vehicles that may experience a catastrophic fire. Given the severe damage and injury a vehicle fire can cause, the rates of a defect leading to a fire must be near zero to be tolerable.

8.      Ford has recalled the Fire Risk Vehicles and instituted a "fix," but the fix Ford is using to resolve the Fire Risk does not address the manufacturing flaws

---

[4] **Exhibit 1**, Ford Motor Company, Certain 2020-2023 Ford Escape and Bronco Sport – Under Hood Fire (Nov. 18, 2022) https://static.nhtsa.gov/odi/rcl/2022/RMISC-22V859-6041.pdf.

[5] **Exhibit 3**, NHTSA Part 573 Safety Recall Report 22V-859 (Nov. 22, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V859-3756.PDF.

[6] **Exhibit 1**, Ford Motor Company, Certain 2020-2023 Ford Escape and Bronco Sport – Under Hood Fire (Nov. 18, 2022) https://static.nhtsa.gov/odi/rcl/2022/RMISC-22V859-6041.pdf.

[7] **Exhibit 3**, NHTSA Part 573 Safety Recall Report 22V-859 (Nov. 22, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V859-3756.PDF.

[8] **Exhibit 1**, Ford Motor Company, Certain 2020-2023 Ford Escape and Bronco Sport – Under Hood Fire (Nov. 18, 2022) https://static.nhtsa.gov/odi/rcl/2022/RMISC-22V859-6041.pdf.

[9] *Id.*

[10] **Exhibit 3**, NHTSA Part 573 Safety Recall Report 22V-859 (Nov. 22, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V859-3756.PDF.

- 4 -

in the fuel injectors that are causing fuel and vapors to leak into the cylinder head (and subsequently onto the exhaust and turbo system) at a rate of 19 liters per hour. Instead, Ford's solution is to (1) update engine control software to detect a pressure drop in the fuel rail and provide messaging to the driver to seek service as well as to derate engine power output and reduce temperatures of possible ignition sources, and (2) install a drain tube to allow fuel to drain from the cylinder head drain hole to the ground below the vehicle.[11] Ford has not even attempted to resolve the underlying issue with the fuel injectors, noting that "the root cause is still under investigation."[12]

9.     Aside from being an inadequate solution, Ford's "fix" creates new problems. Allowing fuel and vapors to leak out of the Fire Risk Vehicles creates an environmental hazard and sets the stage for future property damage and possible injury.

10.     A vehicle that has a risk of spontaneously catching on fire while in operation is not fit for its ordinary purpose. And a "fix" that does nothing to actually address an underlying issue, and in fact creates additional problems, is not a fix at all. Ford is placing an unfair burden on Class members whose vehicles are

---

[11] *Id.*

[12] *Id.*

still equipped with fuel injectors that may crack and leak fuel, and who may now additionally face the risk of fuel and vapors leaking onto their property.

11.     Ford knew or should have known about the Spontaneous Fire Risk before the Fire Risk Vehicles went to market. At the very least, Ford certainly knew about the Spontaneous Fire Risk well before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Fire Risk Vehicles; (2) the direct and public reports of fires in 54 Fire Risk Vehicles; and (3) Ford's own investigation of fires in the Fire Risk Vehicles.

12.     Ford offers no reimbursement to Fire Risk Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value. Because a *bona fide* repair to the fuel injectors is not being made, putative class members are left without a safely operable vehicle for an unknown and potentially lengthy period.

13.     To add further insult to injury, rather than do the right thing and globally offer to provide consumers with a comparable loaner vehicle while Ford fully resolves the issue, Ford has done nothing of the sort.

14.     Because of Ford's omissions regarding the Spontaneous Fire Risk and failure to act more quickly in disclosing and providing a remedy, it has violated state consumer protection acts, been unjustly enriched, and breached implied warranties of merchantability. Plaintiffs and other owners and lessees of the Fire Risk Vehicles have been injured in fact, incurred damages, and suffered

- 6 -

ascertainable losses in money and property. Had Plaintiffs and putative Class members known of the Spontaneous Fire Risk, then they would either not have purchased or leased those vehicles or would have paid less for them. Fires in the Fire Risk Vehicles necessitate expensive repairs, car rentals, car payments, towing charges, property damage, time off work, loss of use, and other miscellaneous costs. And Plaintiffs and Class members whose vehicles have undergone Ford's "fix" must now additionally contend with potential property damage due to leaked fuel and vapors.

15.     Plaintiffs bring this class action to redress Ford's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 23-1-2312, state consumer protection acts, state implied warranty acts, and unjust enrichment at common law.

## II.     JURISDICTION

16.     This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Nationwide Class and each Subclass (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and Class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

17.     This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

## III.   VENUE

18.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

## IV.   PARTIES

**A.    Plaintiffs**

**1.    Richard Letson (Massachusetts)**

19.     Plaintiff and proposed class representative Richard Letson ("Plaintiff for the purposes of this paragraph) is domiciled in Foxborough, Massachusetts, where he is a resident and citizen. Plaintiff purchased a 2022 Model Year Ford Bronco Sport on or about March 5, 2022, from a dealership in Foxborough, Massachusetts. Plaintiff's Ford Bronco Sport is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk.

20.     Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly uses the vehicle for his own transportation needs. He also uses the vehicle to transport his children, aged 18 and 14, to and from school.

- 8 -

21.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability, safety, and the vehicle's benefits for use by families. Plaintiff's trust in the Ford brand led him to conclude, at the time of his purchase, that the Ford Bronco Sport was a reliable and safe vehicle. However, despite touting the safety, reliability, and family-friendly aspects of the Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

22.     Plaintiff does not believe that updating the vehicle's software to warn him of a potential problem or installing a tube to drain fuel away from the vehicle is an adequate "fix" because these changes do not address the underlying manufacturing problems with the fuel injectors. If a manufacturing issue renders the fuel injectors in Plaintiff's vehicle susceptible to cracking and leaking fuel, then Plaintiff believes Ford's fix should remedy that issue, and it should not just provide an escape route for that fuel to end up on the roadway or on Plaintiff's property.

23.     Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," he would not have purchased this vehicle, or he would have paid less for the vehicle.

### 2.    Kara Murray-Volpi (New York)

24.    Plaintiff and proposed class representative Kara Murray-Volpi ("Plaintiff" for the purposes of this paragraph) is domiciled in Yonkers, New York, where she is a resident and citizen. Plaintiff leased a 2020 Model Year Ford Escape on or about March 20, 2021 from a dealership in Yonkers, New York. Plaintiff's Ford Escape is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk.

25.    Plaintiff leased her Fire Risk Vehicle as her primary, day-to-day vehicle. She regularly uses the vehicle for her own transportation needs.

26.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety. Plaintiff's trust in the Ford brand led her to conclude, at the time of signing her lease, that the Ford Escape was a reliable and safe vehicle. However, despite touting the safety and reliability aspects of the Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before she leased the vehicle.

27.    Plaintiff does not believe that updating the vehicle's software to warn her of a potential problem or installing a tube to drain fuel away from the vehicle is an adequate "fix" because these changes do not address the underlying manufacturing problems with the fuel injectors. If a manufacturing issue renders the fuel injectors in Plaintiff's vehicle susceptible to cracking and leaking fuel,

- 10 -

then Plaintiff believes Ford's fix should remedy that issue, and it should not just

provide an escape route for that fuel to end up on the roadway or on Plaintiff's

property.

28.     Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's

proposed "fix," she would not have purchased this vehicle, or she would have paid

less for the vehicle.

### 3.     Richard Reed (West Virginia)

29.     Plaintiff and proposed class representative Richard Reed ("Plaintiff"

for the purposes of this paragraph) is domiciled in Charleston, West Virginia,

where he is a resident and citizen. Plaintiff purchased a 2022 Model Year Ford

Bronco Sport on or about April 29, 2022, from a dealership in St. Alban's, West

Virginia. Plaintiff's Ford Bronco Sport is a Fire Risk Vehicle that suffers from the

Spontaneous Fire Risk.

30.     Plaintiff purchased his Fire Risk Vehicle as his primary, day-to-day

vehicle. He regularly uses the vehicle for his own transportation needs. He also

uses the vehicle to transport his minor daughter to and from school, sports matches,

and Girl Scout outings, among other activities.

31.     Through exposure and interaction with Ford, Plaintiff was aware of

Ford's uniform and pervasive marketing messages of reliability, safety, and the

vehicle's benefits for use by families. Plaintiff's trust in the Ford brand led him to

- 11 -

conclude, at the time of his purchase, that the Ford Bronco Sport was a reliable and safe vehicle. However, despite touting the safety, reliability, and family-friendly aspects of the Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Fire Risk to Plaintiff before his purchase.

32.     Plaintiff does not believe that updating the vehicle's software to warn him of a potential problem or installing a tube to drain fuel away from the vehicle is an adequate "fix" because these changes do not address the underlying manufacturing problems with the fuel injectors. If a manufacturing issue renders the fuel injectors in Plaintiff's vehicle susceptible to cracking and leaking fuel, then Plaintiff believes Ford's fix should remedy that issue, and it should not just provide an escape route for that fuel to end up on the roadway or on Plaintiff's driveway, which is located just a few feet from Plaintiff's house.

33.     Had Plaintiff been aware of the Spontaneous Fire Risk and Ford's proposed "fix," he would not have purchased this vehicle, or he would have paid less for the vehicle.

**B.     Defendant**

34.     Defendant Ford Motor Company ("Ford") is a Delaware limited liability company organized and existing under the laws of the State of Delaware. Ford's principal place of business and headquarters is One American Road, Dearborn, Michigan 48126.

- 12 -

35.     Ford is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Ford motor vehicles. The Ford brand is one of the "Big Three" American automobile brands. Ford engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Ford brand.

36.     Ford, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Ford and its agents designed and manufactured the Fire Risk Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Fire Risk Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. Ford is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

37.     Ford-authorized automobile dealerships sell automobiles under the Ford brand name and disseminate vehicle information provided by Ford to customers. At all relevant times, Ford's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by Ford's manufacturer warranty under the contracts between Ford and its nearly 10,000 authorized dealerships worldwide.

## V.   FACTUAL ALLEGATIONS

**A.   Ford marketed the Fire Risk Vehicles as safe and reliable, and Ford knew that these attributes were material to consumers.**

38.   The Ford Fire Risk Vehicles are marketed to consumers as safe, reliable vehicles, and Ford knew these qualities were material to consumers in marketing them in this manner. These qualities were in fact material to Plaintiffs and Ford had the opportunity when describing safety features in sales material to be truthful.

39.   For example, in the sales brochures for the 2020, 2021, and 2022 Ford Escapes, Ford touted various safety features like pre-collision assist, blind spot alerts, lane-keeping system, and rear-view cameras in the Fire Risk Vehicles because Ford knew safety was material to the average customer.[13]

---

[13] *See* **Exhibit 4**, MY 2020 Ford Escape brochure, at 11; **Exhibit 5**, MY 2021 Ford Escape brochure, at 9, 14; **Exhibit 6**, MY 2022 Ford Escape brochure, at 9, 15.

011148-11/2184574 V1

MAKE YOUR WAY.
# CONFIDENTLY.

Changing lanes. Keeping your distance. Parallel and perpendicular parking. Our extensive well-rounded collection of standard and available Ford Co-Pilot360™ Technology features can help you with these everyday situations and so many more. Our advanced technologies are about supplementing your driving skills.¹ Helping you feel confidently in command on the road.

## FORD CO-PILOT360™ TECHNOLOGY

### FORD CO-PILOT360

*Standard on every 2022 Ford Escape® SUV*
- Pre-Collision Assist with Automatic Emergency Braking (AEB)
- BLIS® (Blind Spot Information System) with Cross-Traffic Alert
- Lane-Keeping System
- Auto High-Beam Headlamps
- Rear View Camera
- Autolamp (Automatic On/Off Headlamps)
- Post-Collision Braking

### FORD CO-PILOT360 ASSIST+

*Standard on Titanium; Available on SE and SEL*
- Intelligent Adaptive Cruise Control with Stop-and-Go and Lane Centering includes Speed Sign Recognition
- Evasive Steering Assist
- Voice-Activated Touchscreen Navigation System



**SCAN TO LEARN MORE**
or visit
Ford.com/Technology
*Data rates may apply.*

- 15 -



40.     In a sales brochure for the 2021 Ford Bronco Sport, Ford again focused on safety features. Knowing safety is material to Plaintiffs and putative Class members, Ford told consumers that the Bronco Sport's built-in Ford Co-Pilot 360 Technology can provide drivers with "even more confidence-boosting features when heading out on the road."[14]

---

[14] **Exhibit 7**, MY 2021 Ford Bronco Sport Brochure v.2 at 12.



[ FORD CO-PILOT360™ TECHNOLOGY ]

Changing lanes. Backing up. Finding the fastest route to the trailhead. The Ford Co-Pilot360 Technology driver-assist features† offered on the Ford Bronco™ Sport are here to help you in your adventures. Ford Co-Pilot360 Assist+ and additional technologies are available, and provide you with even more confidence-boosting features when heading out on the road.

**FORD CO-PILOT360**

The standard suite of tech.

- PRE-COLLISION ASSIST WITH AUTOMATIC EMERGENCY BRAKING
- BLIS® (BLIND SPOT INFORMATION SYSTEM) WITH CROSS-TRAFFIC ALERT
- LANE-KEEPING SYSTEM
- REAR VIEW CAMERA
- AUTO HIGH-BEAM HEADLAMPS

**FORD CO-PILOT360 ASSIST+**

Available on Big Bend,™ Outer Banks™ and Badlands.™

- ADAPTIVE CRUISE CONTROL WITH STOP-AND-GO AND LANE CENTERING *(Speed Sign Recognition included on Outer Banks and Badlands; not available on Big Bend)*
- EVASIVE STEERING ASSIST
- VOICE-ACTIVATED NAVIGATION

- 17 -

41.     In a sales brochure for the 2022 Ford Bronco Sport, Ford refers to the vehicle as "capable"[15] and advertises that customers are assured "a strong sense of confidence."[16]



42.     Knowing that reliability is also material to the average customer, Ford emphasizes the Bronco Sport's overall reliability, telling customers that the Bronco has been "put through its paces,"[17] has undergone the "Bronco Built Wild Extreme

---

[15] **Exhibit 8**, MY 2022 Ford Bronco Sport Brochure at 2.
[16] *Id.* at 12.
[17] **Exhibit 7**, MY 2021 Ford Bronco Sport Brochure v.2 at 6.

- 18 -

Durability test,"[18] and has been through "thousands of lab testing hours and real-world extreme challenges in the harshest terrains." [19] Ford further assures customers that "every Bronco delivers class-leading levels of 4x4 off-road performance capability."[20]



[ PROVEN TOUGHNESS ]

Born from the legendary F-Series Built Ford Tough® testing principles, Bronco's world-class engineers developed the Bronco Built Wild Extreme Durability test. Through thousands of lab testing hours and real-world extreme challenges in the harshest terrains and climates, like Johnson Valley, CA — home to King of the Hammers off-road racing — the mud bogs of Georgia and cold weather of Delta Junction, AK, the team set out to ensure every Bronco delivers class-leading levels of 4x4 off-road performance capability, suspension and trail technologies.

---

[18] **Exhibit 9**, MY 2021 Ford Bronco Sport Brochure v.1 at 1.
[19] *Id.*
[20] *Id.*



43.    Both the 2021 and 2022 sales brochures for the Ford Bronco Sport highlight a host of other safety features, including blind spot detection, a lane-keeping system, pre-collision assist, and a rearview camera, because Ford knew

safety was material to the average customer.[21] The 2022 brochure further boasts that drivers will feel "confidently in command."[22]

**B.    Plaintiffs and Class members paid thousands of dollars for the Fire Risk Vehicles because they thought the vehicles were safe and reliable.**

44.    Plaintiffs and putative Class members, believing in the safety, reliability, and fuel efficiency of the Fire Risk Vehicles as touted by Ford, paid thousands of dollars for the vehicles. The Manufacturer's Suggested Retail Price ("MSRP") for the 2023 Ford Escape starts at $28,995 for the base trim and goes up to $39,955 for the ST-Line Elite trim,[23] and the MSRP for the 2023 Ford Bronco Sport starts at $30,810 for the base trim and goes up to $46,250 for the Heritage Limited trim.[24]

45.    Plaintiffs and putative Class members would not have paid these prices for Fire Risk Vehicles if they had known that the vehicles were not, in fact, safe and reliable, and that Ford's purported "fix" would result in reduced fuel efficiency.

---

[21] **Exhibit 7**, MY 2021 Ford Bronco Sport Brochure v.2 at 12, 15.

[22] **Exhibit 8**, MY 2022 Ford Bronco Sport Brochure at 12.

[23] **Exhibit 10**, *2023 Ford Escape*, EDMUNDS.COM, https://www.edmunds.com/ford/escape (last visited Feb. 16, 2023).

[24] **Exhibit 11**, *2023 Ford Bronco Sport*, EDMUNDS.COM, https://www.edmunds.com/ford/bronco-sport/ (last visited Feb. 16, 2023).

C.     **Ford's Vehicle Warranties**

46.     Ford's New Vehicle Limited Warranty for Model Years 2020, 2021, 2022, and 2023 of the Ford Escape provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[25] Ford's Powertrain Warranty for the 2020, 2021, and 2022 Escapes provides coverage for 5 years/60,000 miles, whichever comes first.[26] On information and belief, this warranty coverage includes manufacturing issues like the Spontaneous Fire Risk in the Fire Risk Vehicles.

47.     Ford's New Vehicle Limited Warranty for the Model Years 2021, 2022, and 2023 Ford Bronco Sports provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[27] Ford's Powertrain Warranty for the 2021, 2022, and 2023 Bronco Sports provides coverage for 5 years/60,000 miles,

---

[25] **Exhibit 4**, MY 2020 Ford Escape brochure, at 16; **Exhibit 5**, MY 2021 Ford Escape brochure, at 16; **Exhibit 6**, MY 2022 Ford Escape brochure, at 16; **Exhibit 12**, 2023 Model Year Ford Warranty Guide at 8, https://www.fordservice content.com/Ford_Content/Catalog/owner_information/23MY_Ford_Car_LtTruck _Hybrid_WG_v1.pdf (last visited Feb. 16, 2023).

[26] **Exhibit 4**, MY 2020 Ford Escape brochure, at 16; **Exhibit 5**, MY 2021 Ford Escape brochure, at 16; **Exhibit 6**, MY 2022 Ford Escape brochure, at 16; **Exhibit 12**, 2023 Model Year Ford Warranty Guide at 11.

[27] **Exhibit 7**, MY 2021 Ford Bronco Sport brochure v.2, at 16; **Exhibit 8**, MY 2022 Ford Bronco Sport brochure, at 16; **Exhibit 12**, 2023 Model Year Ford Warranty Guide at 8.

- 22 -

whichever comes first.[28] On information and belief, this warranty coverage includes manufacturing issues like the Spontaneous Fire Risk in the Fire Risk Vehicles.

48.     Because the Fire Risk Vehicles are all Model Year 2020, 2021, 2022, or 2023 vehicles sold or leased to putative Class members in the fall of 2019 or later,[29] all Fire Risk Vehicles—including Plaintiffs' vehicles—are still covered under Ford's powertrain warranties, and nearly all Fire Risk Vehicles—including Plaintiff Letson's and Plaintiff Reed's vehicles—are still covered under Ford's new vehicle warranties.

**D.     The Spontaneous Fire Risk**

49.     As Ford now admits in a November 18, 2022, safety recall notification to the National Highway Traffic Safety Administration ("NHTSA"), cracked fuel injectors in the engine allow fuel to leak at a rate of 19 liters per hour

---

[28] **Exhibit 7**, MY 2021 Ford Bronco Sport brochure v.2, at 16; **Exhibit 8**, MY 2022 Ford Bronco Sport brochure, at 16; **Exhibit 12**, 2023 Model Year Ford Warranty Guide at 11.

[29] **Exhibit 13**, Joey Capparella, *The 2020 Ford Escape Looks to Fill a Car-Shaped Hole in the Lineup*, CAR & DRIVER (Apr. 2, 2019), https://www.caranddriver.com/news/a26996233/2020-ford-escape-photos-info (release date of fall 2019 for the 2020 Ford Escape) (last visited Feb. 16, 2023); **Exhibit 14**, *2021 Ford Bronco and Bronco Sport On-Sale Dates and How to Order One*, CAR & DRIVER (Jul. 13, 2020), https://www.caranddriver.com/news/a33298341/2021-ford-bronco-bronco-sport-on-sale-dates (release date in "late 2020" for the 2021 Ford Bronco Sport) (last visited Feb. 16, 2023).

into the cylinder head and eventually onto the exhaust/turbo system, where it may combust.[30]

50.    Ford further admits that the issues in the Fire Risk Vehicles can lead to "under hood fire."[31]

51.    Ford's recall, number 22V-859, affects 521,778 total vehicles, including all Model Year 2020–2023 Ford Escapes built between November 19, 2018, and October 17, 2022, and all Model Year 2021–2023 Ford Bronco Sports built between November 19, 2018, and October 17, 2022.[32]

52.    As of November 1, 2022, Ford reported 54 under hood fires on 2020-2022 Model Year Bronco Sport and Escape vehicles equipped with a 1.5L dragon engine.[33] The earliest identified report was on September 9, 2020.[34] Of these fires, 17 have been confirmed as likely the result of a cracked fuel injector.[35]

53.    Included in the 573 Report is Ford's "Description of the Cause," in which Ford admits that "[t]he root cause is still under investigation."[36] Whatever

---

[30] **Exhibit 3**, NHTSA Part 573 Safety Recall Report 22V-859 at 2 (Nov. 22, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V859-3756.PDF.

[31] *Id.*

[32] *Id.* at 1.

[33] **Exhibit 1**, Ford Motor Company, Certain 2020-2023 Ford Escape and Bronco Sport – Under Hood Fire, at 1 (Nov. 18, 2022) https://static.nhtsa.gov/odi/rcl/2022/RMISC-22V859-6041.pdf.

[34] *Id.* at 2.

[35] *Id.*

[36] **Exhibit 3**, NHTSA Part 573 Safety Recall Report 22V-859 at 2 (Nov. 22, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V859-3756.PDF.

the root cause, the consequence is that fuel injectors in the affected Fire Risk

Vehicles crack, "resulting in fuel and/or fuel vapor migrating to and/or

accumulating near ignition sources resulting in potential under hood fire."[37]

54.     Thus, Ford admits that the Fire Risk Vehicles suffer from issues with

their fuel injectors. But Ford's fix is wholly silent as to this admittedly affected

component. Instead, Ford has opted to install new software to prompt "the

customer to seek service" in the event the software detects "a pressure drop in the

fuel rail," and it has decided to install a "drain tube . . . to allow fuel to drain from

the cylinder head drain hole . . . to the ground below the vehicle."[38] This "fix" does

not live up to its name because the fuel injectors in the Fire Risk Vehicles may still

crack and leak fuel at a rate of 19 liters per hour—a problem Ford does not

address.

55.     On information and belief, Ford failed to adequately research, design,

test, and manufacture the Fire Risk Vehicles before warranting, advertising,

promoting, marketing, and selling the Fire Risk Vehicles as suitable and safe for

use in an intended and reasonably foreseeable manner.

56.     On information and belief, Ford knew or should have known the Fire

Risk Vehicles contained the Spontaneous Fire Risk and should have warned or

---

[37] *Id.*

[38] *Id.*

disclosed this fact to Plaintiffs and putative class members before selling or leasing the vehicles.

57.     Ford plainly knows that the "fix" it is implementing with its recall will not resolve the fuel injector issue that is causing fuel to leak from the Fire Risk Vehicles at a rate of 19 liters per hour.

58.     Ford also knows or should know that its "fix" will actually cause additional problems, including potential property damage or personal injury from fuel that drains from the Fire Risk Vehicles.

59.     Plaintiffs' counsel continues to investigate whether additional manufacturing periods and Model Years of the Ford Escape and Ford Bronco Sports are also plagued with the Spontaneous Fire Risk.

**E.     Ford knew or should have known of the Spontaneous Fire Risk before it disclosed the risk to Plaintiffs.**

60.     On information and belief, Ford knew or should have known about the Spontaneous Fire Risk before the Fire Risk Vehicles went to market. At the very least, Ford knew or should have known of the Spontaneous Fire Risk well before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Fire Risk Vehicles; (2) the direct and public reports of fires in 54 Fire Risk Vehicles; and (3) Ford's own investigation of fires in the Fire Risk Vehicles.

011148-11/2184574 V1

1.     **Ford's durability testing should have uncovered the Spontaneous Fire Risk.**

61.     Ford claims to conduct comprehensive and rigorous testing on all its vehicles, saying, "Ford's comprehensive lineup of testing facilities around the world puts vehicles through everything from the extreme, to the everyday, to ensure that only world-class vehicles roll off the production line."[39]

62.     According to Ford, at their facilities across Thailand, India, Australia, the Middle East, and China, "Ford vehicles and components are 'shaken, rattled and rolled' in a variety of tests, some conducted in temperatures ranging from an arctic minus 40 degrees Celsius, to desert-scorching heat of over 50 degrees Celsius."[40] These tests include stresses on the engines, moving parts, suspension, and electrical components.[41]

63.     Ford even puts its vehicles through a Total Durability Cycle, described by Ford as "sped-up evaluation runs around the clock, day and night, to simulate 10 years, or 240,000km, of severe customer usage in just a few weeks."[42] "Gravel roads, cobblestones, pot-holes, curbs and water baths feature in this

---

[39] **Exhibit 15**, *Testing in the Extremes: How Ford's Multiple Testing Facilities Push Vehicles to the Limit*, FORD.COM (Oct. 7, 2019), https://media.ford.com/content/fordmedia/img/me/en/news/2019/10/07/testing-in-the-extremes--how-fords-multiple-testing-facilities-p.html (last visited Feb. 16, 2023).

[40] *See id.*

[41] *See id.*

[42] *See id.*

grueling test" and, "[j]ust for good measure, environmental factors like dust, water and mud are thrown in, while dynamometers simulate towing heavy loads in traffic and over mountain passes."[43]

64.     On information and belief, the Fire Risk Vehicles were put through similar durability testing or were designed and built in accordance with the findings of such durability testing. Indeed, as already described, Ford specifically advertised to Bronco Sport consumers with the promise that the Bronco Sport has undergone the "Bronco Built Wild Extreme Durability test,"[44] and has been through "thousands of lab testing hours and real-world extreme challenges in the harshest terrains."[45] On information and belief, the Ford Escape was put through equally stringent testing.

65.     Based on such durability testing, Ford did or should have uncovered the Spontaneous Fire Risk before the Fire Risk Vehicles were sold to Plaintiffs and putative Class members.

**2.     Ford knew about the Spontaneous Fire Risk from warranty claims for Fire Risk Vehicles and its own investigation.**

66.     According to its recall chronology, an issue pertaining to under hood fires in 2020-2022 Model Year Ford Escapes and Ford Bronco Sport vehicles was

---

[43] *See id.*
[44] **Exhibit 9**, MY 2021 Ford Bronco Sport Brochure v.1 at 1.
[45] *Id.*

brought to Ford's Critical Concern Review Group for review on August 18, 2022.[46] During the Review Group's analysis, it included data from 36 reports of under hood fire for 2020-2022 Model Year 1.5L Escape and Bronco Sport vehicles.[47] Inspection of these vehicles raised concern of a contributing cause for under hood fires in addition to an issue with the vehicles' oil separator, for which the vehicles had undergone a separate recall.[48]

67.   As of November 1, 2022, there were 54 reports of under hood fires on 2020-2022 Model Year Ford Escape and Bronco Sport vehicles, inclusive of the 36 reports previously described.[49] Of these fires, 17 have been confirmed as likely the result of a cracked fuel injector.[50] There were also 143 reports of fuel injectors with external leak failures reported among these vehicles.[51]

68.   Ford did not disclose the dates of the 54 fires in the Fire Risk Vehicles, but on information and belief, Ford learned of at least some of these fires on or before the August 18, 2022, investigation launch.

---

[46] **Exhibit 1**, Ford Motor Company, Certain 2020-2023 Ford Escape and Bronco Sport – Under Hood Fire at 1 (Nov. 18, 2022) https://static.nhtsa.gov/odi/rcl/2022/RMISC-22V859-6041.pdf.

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.* at 2 (relying on warranty data accessed on October 19, 2022).

69.     All vehicle manufacturers, including Ford, also routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, Ford has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Fire Risk Vehicles.[52]

70.     Ford also receives complaints directly from consumers and its dealers, and thus, on information and belief, has knowledge of all complaints lodged to it or its agents regarding the Fire Risk Vehicles and the Spontaneous Fire Risk. At a minimum, Ford received complaints from many scared and angry owners and lessees who learned about the Spontaneous Fire Risk.

71.     However, Ford has yet to address the manufacturing issues associated with the fuel injectors. Instead, Ford has directed that engine control software be updated to provide a warning to consumers and to derate engine power output and reduce temperatures of possible ignition sources, and that a tube be installed to drain fuel out of the vehicle to the ground below in the event a fuel injector cracks.[53] After the modifications are complete, Plaintiffs and Class members will be left with vehicles that will leak highly flammable fuel if their fuel injectors succumb to the manufacturing issues identified. And Ford is not globally offering

---

[52] *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).
[53] **Exhibit 3**, NHTSA Part 573 Safety Recall Report 22V-859 (Nov. 22, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V859-3756.PDF.

- 30 -

to provide loaner or rental vehicles until it can actually fix the manufacturing problem.

72.    Because the Fire Risk Vehicles have manufacturing flaws that may cause fuel injectors to crack and Ford is not fixing this and is instead creating a risk that fuel will drain into garages, roadways, and the environment, all owners and lessees of the Fire Risk Vehicles have suffered ascertainable loss.

**F.    Class members could have been made aware of the Spontaneous Fire Risk at the point of sale.**

73.    Plaintiffs and all putative Class members were necessarily exposed to Ford's omissions before purchasing the Fire Risk Vehicles because they each interacted with an authorized Ford dealer at the point of sale. These dealers could have disclosed the omitted information to each Class member, but they failed to do so. As a district court affirmed in another consumer class action case against Ford, all Class members in that case would have "been aware of a disclosure" from Ford about the defect at the point of sale because Class members "interact[ed] with an authorized Ford dealer prior to purchase."[54] The same is true here.

---

[54] *Daniel v. Ford Motor Co.*, 2016 WL 8077932, at *8 (E.D. Cal. Sept. 23, 2016).

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

**A.    Discovery Rule Tolling**

74.    Because Ford (i) omitted the existence of the Spontaneous Fire Risk, and (ii) omitted the fact that the recall repair does not fix the manufacturing flaw and instead creates additional risks and reduces fuel efficiency, Class members had no way of knowing about the potential danger of the Fire Risk Vehicles and the lack of a *bona fide* repair during the recall.

75.    Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that Ford was not revealing the existence of the Spontaneous Fire Risk complained of herein and not repairing it during the recall.

76.    Plaintiffs and putative Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Ford had omitted information about the unreasonable fire risk of the Fire Risk Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

77.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Fire Risk Vehicles.

**B.      Estoppel**

78.     Ford was under a continuous duty to disclose to Plaintiffs and putative Class members the true character, quality, and nature of the Spontaneous Fire Risk of the Fire Risk Vehicles.

79.     Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the Spontaneous Fire Risk of the Fire Risk Vehicles and it knowingly, affirmatively and actively concealed or recklessly disregarded the true nature, quality and character of the repair it was performing under the recall of the Fire Risk Vehicles.

80.     Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

81.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class and Subclasses:

> **Nationwide Class**: All persons or entities who purchased or leased model year 2020-2023 Ford Escape or 2021-2023 Ford Bronco Sport vehicles (the "Fire Risk Vehicles").

- 33 -

**Massachusetts Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the Commonwealth of Massachusetts.

**New York Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of New York.

**West Virginia Subclass**: All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of West Virginia.

82.     Plaintiffs assert claims under the laws of each state set forth below.

83.     Excluded from the definitions of each Class and Subclass are any personal injury or property damages claims resulting from the fires or explosions caused by the Fire Risk Vehicles, as well as any personal injury or property damages claims resulting from fuel that drains from a Fire Risk Vehicle that has undergone Ford's "fix." Also excluded from the Class and Subclasses are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

84.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

85.    This action has been brought and may be properly maintained on behalf of the Class and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

86.    **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Class and Subclasses are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be at least 521,778 Fire Risk Vehicles in the Nationwide Class. The precise number of Class and Subclass members is unknown to Plaintiffs but may be ascertained from Ford's books and records. Class and Subclass members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and published notice.

87.    **Commonality and Predominance**: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass members, including, without limitation:

    a.    Whether Ford engaged in the conduct alleged herein;

    b.    Whether the Spontaneous Fire Risk creates an unreasonable risk of fires in the Fire Risk Vehicles;

    c.    When Ford first knew about the Spontaneous Fire Risk;

d.   Whether Ford designed, manufactured, marketed, and distributed the Fire Risk Vehicles with manufacturing flaws or defective component(s) that cause under hood fire;

e.   Whether Ford's conduct renders it liable for breach of the implied warranty of merchantability;

f.   Whether Ford has been unjustly enriched at the expense of Plaintiffs and the Class and Subclasses;

g.   Whether Plaintiffs and the other Class and Subclass members overpaid for their vehicles at the point of sale; and

h.   Whether Plaintiffs and the other Class and Subclass members are entitled to damages and other monetary relief and, if so, in what amount.

88.   **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class and Subclass members' claims because, among other things, all Class and Subclass members were comparably injured through Ford's wrongful conduct as described above.

89.   **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class and Subclasses will be fairly and adequately protected by Plaintiffs and their counsel.

- 36 -

90. **<u>Superiority</u>**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Class and Subclasses to individually seek redress for Ford's wrongful conduct. Even if Class and Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  CLAIMS

**A.**    **Nationwide Claims**

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq*.)

**(Alleged by all Plaintiffs on behalf of the Nationwide Class)**

91.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

92.    Plaintiffs bring this claim on behalf of the Nationwide Class.

93.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

94.    The Fire Risk Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

95.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

96.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

97.    Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of

their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Fire Risk Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

98.     Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiffs and Nationwide Class members under 15 U.S.C. § 2310(d)(1). Without limitation, the Fire Risk Vehicles share a common defect in that they all suffer from an issue with their fuel injectors cracking that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

99.     As discussed herein, on information and belief, Ford knew or should have known about the Spontaneous Fire Risk from its own durability testing of the Fire Risk Vehicles before launching the Fire Risk Vehicles. Ford omitted information about the fuel injector defect and its consequences from Plaintiff and

Class members, misrepresented the qualities of the Fire Risk Vehicles, and has failed to provide a fix for the fuel injector defect.

100. Ford further breached its implied warranties, as described herein, and is therefore liable to Plaintiff and Nationwide Class members under 15 U.S.C. § 2310(d)(1) because it is performing a recall and "repair" that does not actually repair the Spontaneous Fire Risk and instead creates further risks and hazards from fuel that drains onto the ground, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The deceptive nature of the repair issued by Ford to address the Spontaneous Fire Risk rendered the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

101. As discussed herein, Ford knew at the time it issued the recall and repair that the repair would not address the manufacturing defect in the Fire Risk Vehicles. Ford omitted information about the recall repair and its consequences from Plaintiffs and Class members, misrepresented the qualities of the recall and repair of the Fire Risk Vehicles, and has failed to provide a fix for the manufacturing defect.

- 40 -

102. Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Fire Risk Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

103. Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiffs, because, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

104. Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew or should have known that the Fire Risk Vehicles were defective and that the Fire Risk Vehicles could catch on fire when used as intended long before Plaintiffs and Class members knew or should have known. Ford further knew that the recall repair it deployed did not actually mitigate or fix the manufacturing defect that results in the Spontaneous Fire Risk. Ford failed to disclose this risk to Plaintiffs and Class members. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

105. Plaintiffs have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiff. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's

- 41 -

implied warranties. The dealers were not intended to be the ultimate consumers of the Fire Risk Vehicles and have no rights under the warranty agreements provided with the Fire Risk Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Fire Risk Vehicles are dangerous instrumentalities due to the Spontaneous Fire Risk, as under hood fires present an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles.

106.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff under Rule 23 of the Federal Rules of Civil Procedure.

107.   Plaintiffs would suffer economic hardship if they returned their Fire Risk Vehicles but did not receive the return of all payments made by them. Because Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Fire Risk Vehicles by retaining them.

108.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other

Nationwide Class members, seek all damages permitted by law, including diminution in value of the Fire Risk Vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and Nationwide Class members in connection with the commencement and prosecution of this action.

109. Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Spontaneous Fire Risk in their Fire Risk Vehicles.

## COUNT II

## FRAUDULENT CONCEALMENT
## (COMMON LAW)

### (Alleged by Plaintiffs on behalf of the Nationwide Class)

110. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

111. Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the State-specific Subclasses.

112. A nationwide class is appropriate because the elements of a fraudulent concealment (or "fraud by concealment") claim are virtually identical in all states.

- 43 -

In all states, Plaintiffs can prevail by showing that: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles; or (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles; or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; or (d) failed to disclose material information concerning the recall repair for the Spontaneous Fire Risk; and (iii) as a result of Ford's conduct, Plaintiffs suffered economic damages.

113.   Ford concealed and suppressed material facts concerning the serious safety issues with Plaintiffs' vehicles. Ford concealed and suppressed material facts concerning the recall repair of Plaintiffs' vehicles.

114.   Ford sold the Fire Risk Vehicles to Plaintiffs without disclosing the Spontaneous Fire Risk and concealed and suppressed the risk from regulators and consumers.

115.   Ford concealed and suppressed the Spontaneous Fire Risk with the intent to deceive Plaintiffs.

116.   Ford did so in order to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and reliable and would live up to the performance characteristics associated

- 44 -

with the Ford brand, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality, safety, and performance of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

117.  Ford had a duty to disclose the Spontaneous Fire Risk because it was known and only knowable by Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiffs. Ford also had a duty to disclose because it made many affirmative representations about the safety, high performance, and quality of the Fire Risk Vehicles, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

118.  Ford concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiffs and the Nationwide Class.

119.  On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Nationwide Class and

- 45 -

conceal material information regarding the Spontaneous Fire Risk. This is especially true in the context of Ford's purported "fix," which does not actually fix the underlying issue causing the fuel injectors to crack but instead simply drains fuel out of the car once a crack occurs.

120.   Plaintiffs were unaware of these omitted material facts and would have acted different if they had known of the concealed and/or suppressed facts. If Plaintiffs knew of the Spontaneous Fire Risk and of Ford's proposed "fix," they would not have purchased their Fire Risk Vehicles or would have paid less for them. Plaintiffs' actions at the time they purchased their Fire Risk Vehicles were justified because Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

121.   Because of the concealment and/or suppression of the facts, Plaintiffs and other Class members sustained damage. In purchasing their Fire Risk Vehicles, Plaintiffs did not get the benefit of their bargain since the vehicles were worth less than they would have been without the Spontaneous Fire Risk, and because they own vehicles that have diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the Spontaneous Fire Risk. Those Nationwide Class members who sold their dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell

- 46 -

between now and the time Ford implements an adequate recall repair (if it ever does).

122.   Accordingly, Ford is liable to Plaintiffs and the Nationwide Class for damages in an amount to be proven at trial.

123.   Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and well-being in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**

**UNJUST ENRICHMENT**
**(COMMON LAW)**

**(Alleged by all Plaintiffs on behalf of the Nationwide Class)**

124.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

125.   Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the California Subclass. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all states.

126.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class.

- 47 -

127.   Ford has received and retained a benefit from Plaintiffs and Nationwide Class members and inequity has resulted.

128.   Ford has benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct described herein, at a profit, and Plaintiffs and Nationwide Class members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

129.   Thus, Plaintiffs and the Nationwide Class conferred a benefit on Ford.

130.   It is inequitable for Ford to retain these benefits.

131.   Plaintiffs and Nationwide Class members were not aware of the true facts about the Fire Risk Vehicles and did not benefit from Ford's conduct described herein.

132.   Ford knowingly accepted the benefits of its unjust conduct.

133.   As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**B.      State-Specific Claims**

    **1.      Massachusetts**

**COUNT IV**

**BREACH OF MASSACHUSETTS'S IMPLIED WARRANTY OF MERCHANTABILITY**
**(Mass. Gen. Laws Ann. Ch. 106, § 2-314)**

**(Alleged by Plaintiff Letson on behalf of the Massachusetts Subclass)**

134.    Plaintiff and the Massachusetts Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

135.    Plaintiff brings this action on behalf of himself and the Massachusetts Subclass.

136.    Ford is a "merchant" of motor vehicles, and the Fire Risk Vehicles are "goods" under Massachusetts law. *See* MGLA Ch. 106, § 2-104(1).

137.    Under MGLA Ch. 106, § 2-314, a warranty that the Fire Defect Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the Massachusetts Subclass members purchased or leased them.

138.    The Fire Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Risk described herein. Without limitation, the Fire Risk Vehicles share a common defect in that they all suffer from an issue with their fuel injectors that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners

- 49 -

and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

139.   The fuel injector defect existed at the time the Fire Risk Vehicles implicated by the Spontaneous Fire Risk left Ford's possession or control.

140.   Based upon the dangerous product defect, Ford failed to meet the expectations of a reasonable consumer. The Fire Risk Vehicles failed their ordinary, intended use because the vehicles contain the Spontaneous Fire Risk and therefore do not function as a reasonable consumer would expect.

141.   Plaintiff and the Massachusetts Subclass have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between them. Nonetheless, privity is not required here because Plaintiff and the Massachusetts Subclass are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Fire Risk Vehicles and have no rights under the warranty agreements provided with the Fire Risk Vehicles; the warranty agreements were designed for and intended to benefit consumers.

142.   In addition, or in the alternative, Plaintiffs and the Massachusetts Subclass members directly relied on Ford's advertising, as alleged above.

143.   It was reasonable to expect that Plaintiff and the Massachusetts Subclass would be affected by the Fire Risk Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability

144.    Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by the filing of this Complaint, by letters from Plaintiffs' counsel, by consumer complaints to NHTSA regarding the Fire Risk that is the subject of this Complaint, and/or by the allegations contained in this Complaint. In addition, on or about February 16, 2023, Plaintiffs' counsel sent notice letters to Ford to the extent such notice is required.

145.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the other Massachusetts Subclass members have been damaged in an amount to be determined at trial.

2. **New York**

**COUNT V**

**VIOLATION OF NEW YORK'S DECEPTIVE ACTS AND PRACTICES**
**(N.Y. Gen. Bus. Law § 349, *et seq.*)**

**(Alleged by Plaintiff Murray-Volpi on behalf of the New York Subclass)**

146.   Plaintiff Murray-Volpi ("Plaintiff" for the purposes of this claim) and the New York Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

147.   Plaintiff brings this action on behalf of herself and the New York Subclass.

148.   Plaintiff and the New York Subclass members are "persons" within the meaning of New York General Business Law ("NYGBL"), N.Y. Gen. Bus. Law § 349(h).

149.   Ford is a "person," "firm," "corporation," or "association" within the meaning of NYGBL Section 349.

150.   NYGBL Section 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce, or in the furnishing of any service in this state. . . ." Material omissions are also actionable under NYGBL § 349.

151.   By omitting the Spontaneous Fire Risk and misleading Plaintiff and the New York Subclass about the Fire Risk Vehicles and the recall repair, Ford's

- 52 -

conduct described herein constitutes "deceptive acts or practices" within the meaning of the NYGBL.

152.   In the course of its business, Ford violated NYGBL Section 349 and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Risk Vehicles because it misrepresented and omitted material facts concerning the Fire Risk Vehicles, specifically the existence of the Spontaneous Fire Risk and the nature of the recall repair, as alleged herein. Ford omitted the fact of the Spontaneous Fire Risk from Plaintiff and the New York Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Risk Vehicles given the existence of the Spontaneous Fire Risk.

153.   Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Risk Vehicles to Plaintiff and the New York Subclass.

154.   By failing to disclose and omitting the Spontaneous Fire Risk in the Fire Risk Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of NYGBL.

155.   The Spontaneous Fire Risk would be material to a reasonable consumer, such as the New York Subclass, and it is material to Plaintiff.

156.   Ford's deceptive act or practices described herein concerning the Spontaneous Fire Risk and the Fire Risk Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the New York Subclass, and did in fact deceive and mislead Plaintiff.

157.   Ford failed to disclose material information about the Spontaneous Fire Risk and the Fire Risk Vehicles, which Ford possessed and of which consumers, like Plaintiff and the New York Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Risk and the Fire Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the New York Subclass, and did in fact deceive and mislead Plaintiff.

158.   Plaintiff could not have discovered the existence of the Spontaneous Fire Risk, or Ford's deception and responsibility for the Spontaneous Fire Risk, until shortly before this class action was commenced.

159.   Ford knew or should have known that its conduct violated NYGBL.

160.   Ford knew or should have known about the Spontaneous Fire Risk affecting the Fire Risk Vehicles owned or leased by Plaintiff and the New York Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in 54 Fire Risk Vehicles; and (iii) Ford's own investigation of fires in the Fire Risk Vehicles.

- 54 -

161.   As alleged above, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Risk Vehicles that were either false or misleading.

162.   Ford owed Plaintiff and the New York Subclass a duty to disclose the true safety and reliability of the Fire Risk Vehicles because Ford:

   a.   Possessed exclusive knowledge about the Spontaneous Fire Risk;

   b.   Omitted the foregoing from Plaintiff and the New York Subclass;

   c.   Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Risk Vehicles, while withholding material facts from Plaintiff and the New York Subclass that contradicted these representations; and/or

   d.   Had duties under the TREAD Act and related regulations to disclose and remedy the Fire Risk well prior to the issue of its recall notice in 2022.

163.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the New York Subclass. Because Ford omitted the Spontaneous Fire Risk, Plaintiff and the New York Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Risk. Had Plaintiff and the New York Subclass been aware of the Spontaneous Fire Risk in their vehicles, they would

- 55 -

have either not have bought their Fire Risk Vehicles or would have paid less for them.

164. Ford's violations of NYGBL present continuing risk and harm to Plaintiff, the New York Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate fix for the defective fuel injectors.

165. Because Ford's deceptive acts and practices caused injury to Plaintiff and the New York Subclass, they seek monetary relief against Ford in the greater amount of actual damages or statutory damages, and reasonable attorneys' fees and costs. Plaintiff and the New York Subclass also seek an order enjoining Ford's unlawful practices and any other just and proper relief available under NYGBL Section 349.

## COUNT VI

### VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT
### (N.Y. Gen. Bus. Law § 350)

**(Alleged by Plaintiff Murray-Volpi on behalf of the New York Subclass)**

166. Plaintiff and the New York Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

167. Plaintiff brings this action on behalf of herself and the New York Subclass.

168. Ford was and is engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

011148-11/2184574 V1

169.   New York's General Business Law ("NYGBL") Section 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity. . . ." N.Y. Gen. Bus. Law § 350-a.

170.   Ford caused to be made or disseminated through New York, through representations, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiff and the New York Subclass members.

171.   Ford violated NYGBL Section 350 because it omitted facts regarding the Spontaneous Fire Risk and misrepresented the safety, quality, functionality, and reliability of the Fire Risk Vehicles to Plaintiff and New York Subclass members, as alleged herein, which were material omissions and misrepresentations and likely to deceive a reasonable consumer, such as Plaintiff and New York Subclass members.

172.   Plaintiff and the New York Subclass suffered injury, including the loss of money or property, because of Ford's false advertising. In purchasing or

- 57 -

leasing their Fire Risk Vehicles, Plaintiff and the New York Subclass members relied on Ford's misrepresentations and omissions regarding the safety, quality, functionality, and reliability of the Fire Risk Vehicles. Had Plaintiff and the New York Subclass members known about the Spontaneous Fire Risk, they would not have purchased or leased their Fire Risk Vehicles or paid as much for them.

173. Under NYGBL Section 350, Plaintiff and the New York Subclass seek monetary relief against Ford in the greater amount of actual damages or statutory damages. Plaintiff and the New York Subclass also seek an order enjoining Ford's unlawful practices, attorneys' fees, costs, and any other just and proper relief available under NYGBL Section 350.

**COUNT VII**

**BREACH OF NEW YORK'S IMPLIED WARRANTY
OF MERCHANTABILITY
(N.Y. U.C.C. Law §§ 2-314; 2A-212)**

**(Alleged by Plaintiff Murray-Volpi on behalf of the New York Subclass)**

174. Plaintiff and the New York Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

175. Plaintiff brings this action on behalf of herself and the New York Subclass.

176. Ford is a "merchant[]" and "seller[]" of motor vehicles, and the Fire Risk Vehicles are "goods" under New York law. *See* N.Y. U.C.C. § 2-104(1).

- 58 -

177.  Under N.Y. U.C.C. §§ 2-314; 2A-212, an implied warranty of merchantability attaches to the Fire Risk Vehicles when they were sold or leased by Ford to Plaintiff and the New York Subclass members.

178.  The Fire Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Risk described herein. Without limitation, the Fire Risk Vehicles share a common defect in that they all suffer from an issue with their fuel injectors that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

179.  The fuel injector defect existed at the time the Fire Risk Vehicles containing the Spontaneous Fire Risk left the possession or control of Ford.

180.  Based upon the dangerous product defect, Ford failed to meet the expectations of a reasonable consumer. The Fire Risk Vehicles failed their ordinary, intended use because the vehicles contain the Spontaneous Fire Risk and therefore do not function as a reasonable consumer would expect.

181.   Plaintiff and the New York Subclass have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between them. Nonetheless, privity is not required here because Plaintiff and the New York Subclass are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Fire Risk Vehicles and have no rights under the warranty agreements provided with the Fire Risk Vehicles; the warranty agreements were designed for and intended to benefit consumers.

182.   It was reasonable to expect that Plaintiff and the New York Subclass would be affected by the Fire Risk Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability.

183.   Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by the filing of this Complaint, by consumer complaints to NHTSA regarding the Fire Risk that is the subject of this Complaint, and/or by the allegations contained in this Complaint. In addition, on or about February 16, 2023, Plaintiffs' counsel sent notice letters to Ford to the extent such notice is required.

184.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the New York Subclass have been damaged in an amount to be determined at trial.

### 3.    West Virginia

**COUNT VIII**

**VIOLATION OF WEST VIRGINIA'S GENERAL CONSUMER PROTECTION ACT**
**(W. Va. Code Ann. § 46A-6-101, *et seq.*)**

185.    Plaintiff Reed ("Plaintiff" for the purposes of this claim) and the West Virginia Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

186.    Plaintiff brings this action on behalf of himself and the West Virginia Subclass.

187.    Plaintiff and the West Virginia Subclass members are "consumers" within the meaning of West Virginia's General Consumer Protection Act (WVCPA) § 46A-6-102(2).

188.    WVCPA § 46A-6-104 declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Such unlawful acts or practices are defined to include, among other things, "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have," *id.*

- 61 -

§ 46A-6-102(7)(E), "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model if they are of another," *id.* § 46A-6-102(7)(G), and "[a]dvertising . . . any statement or representation with regard to the sale of goods . . . which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive," *id.* § 46A-6-102(7)(N).

189.   By omitting the Spontaneous Fire Risk and misleading Plaintiff and the West Virginia Subclass about the Fire Risk Vehicles and the recall repair, Ford's conduct described herein constitutes "deceptive acts or practices" within the meaning of the WVCPA.

190.   In the course of its business, Ford violated WVCPA § 46A-6-104 and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Risk Vehicles because it misrepresented and omitted material facts concerning the Fire Risk Vehicles, specifically the existence of the Spontaneous Fire Risk and the nature of the recall repair, as alleged herein. Ford omitted the fact of the Spontaneous Fire Risk from Plaintiff and the West Virginia Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Risk Vehicles given the existence of the Spontaneous Fire Risk.

191.   Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Risk Vehicles to Plaintiff and the West Virginia Subclass.

192.   By failing to disclose and omitting the Spontaneous Fire Risk in the Fire Risk Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of WVCPA.

193.   The Spontaneous Fire Risk would be material to a reasonable consumer, such as the West Virginia Subclass, and it is material to Plaintiff.

194.   Ford's deceptive act or practices described herein concerning the Spontaneous Fire Risk and the Fire Risk Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the West Virginia Subclass, and did in fact deceive and mislead Plaintiff.

195.   Ford failed to disclose material information about the Spontaneous Fire Risk and the Fire Risk Vehicles, which Ford possessed and of which consumers, like Plaintiff and the West Virginia Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Risk and the Fire Risk Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the West Virginia Subclass, and did in fact deceive and mislead Plaintiff.

- 63 -

196.   Plaintiff could not have discovered the existence of the Spontaneous Fire Risk, or Ford's deception and responsibility for the Spontaneous Fire Risk, until shortly before this class action was commenced.

197.   Ford knew or should have known that its conduct violated the WVCPA.

198.   Ford knew or should have known about the Spontaneous Fire Risk affecting the Fire Risk Vehicles owned or leased by Plaintiff and the West Virginia Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in 54 Fire Risk Vehicles; and (iii) Ford's own investigation of fires in the Fire Risk Vehicles.

199.   As alleged above, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Risk Vehicles that were either false or misleading.

200.   Ford owed Plaintiff and the West Virginia Subclass a duty to disclose the true safety and reliability of the Fire Risk Vehicles because Ford:

   a.   Possessed exclusive knowledge about the Spontaneous Fire Risk;

   b.   Omitted the foregoing from Plaintiff and the West Virginia Subclass;

   c.   Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Risk Vehicles, while withholding material facts from Plaintiff and

- 64 -

        the West Virginia Subclass that contradicted these representations; and/or

  d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Fire Risk well prior to the issue of its recall notice in 2022.

201.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the West Virginia Subclass. Because Ford omitted the Spontaneous Fire Risk, Plaintiff and the West Virginia Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Risk. Had Plaintiff and the West Virginia Subclass been aware of the Spontaneous Fire Risk in their vehicles, they would have either not have bought their Fire Risk Vehicles or would have paid less for them.

202.   Ford's violations of WVCPA present continuing risk and harm to Plaintiff, the West Virginia Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate fix for the defective fuel injectors. Furthermore, Ford's "fix" raises additional safety concerns.

203.   Because Ford's deceptive acts and practices caused injury to Plaintiff and the West Virginia Subclass, they seek monetary relief against Ford in the greater amount of actual damages or statutory damages, and reasonable attorneys' fees and costs. Plaintiff and the West Virginia Subclass also seek an order

enjoining Ford's unlawful practices and any other just and proper relief available under WVCPA § 46A-6-102.

## COUNT IX

### BREACH OF WEST VIRGINIA'S IMPLIED WARRANTY OF MERCHANTABILITY (W. Va. Code Ann. § 46-2-314)

**(Alleged by Plaintiff Reed on behalf of the West Virginia Subclass)**

204.    Plaintiff and the West Virginia Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

205.    Plaintiff brings this action on behalf of himself and the West Virginia Subclass.

206.    Ford is a "merchant" of motor vehicles, and the Fire Risk Vehicles are "goods" under West Virginia law. *See* W. Va. Code Ann. § 46-2-314(1).

207.    Under W. Va. Code Ann. § 46-2-314, an implied warranty of merchantability attaches to the Fire Risk Vehicles when they were sold or leased by Ford to Plaintiff and the West Virginia Subclass members.

208.    The Fire Risk Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Risk described herein. Without limitation, the Fire Risk Vehicles share a common defect in that they all suffer from an issue with their fuel injectors that makes the vehicles susceptible to a risk of spontaneous fire, causing an

- 66 -

unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Risk rendered the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

209.   The fuel injector defect existed at the time the Fire Risk Vehicles containing the Spontaneous Fire Risk left the possession or control of Ford.

210.   Based upon the dangerous product defect, Ford failed to meet the expectations of a reasonable consumer. The Fire Risk Vehicles failed their ordinary, intended use because the vehicles contain the Spontaneous Fire Risk and therefore do not function as a reasonable consumer would expect.

211.   Plaintiff and the West Virginia Subclass have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between them. Nonetheless, privity is not required here because "no action by a consumer for breach of warranty . . . with respect to goods subject to a consumer transaction shall fail because of a lack of privity between the consumer and the party against whom the claim is made." WVCPA § 46A-6-108.

- 67 -

212.   It was reasonable to expect that Plaintiff and the West Virginia Subclass would be affected by the Fire Risk Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability.

213.   Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by the filing of this Complaint, by consumer complaints to NHTSA regarding the Fire Risk that is the subject of this Complaint, and/or by the allegations contained in this Complaint. In addition, on or about February 16, 2023, Plaintiffs' counsel sent notice letters to Ford to the extent such notice is required.

214.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the West Virginia Subclass have been damaged in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State-specific Subclasses, respectfully request that the Court enter judgment in their favor and against Ford, as follows:

A.   Certification of the proposed Nationwide Class and State-specific Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.      Restitution, including at the election of Nationwide Class and State-specific Subclass members, recovery of the purchase price of their Fire Risk Vehicles, or the overpayment for their vehicles;

C.      Damages, costs, and disgorgement in an amount to be determined at trial;

D.      An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

E.      An award of costs and attorneys' fees;

F.      An order enjoining Ford's deceptive acts or practices; and

G.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: February 17, 2023               Respectfully Submitted,

 */s/ Steve W. Berman*
Steve W. Berman
Thomas E. Loeser
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

- 69 -

Abigail D. Pershing
**HAGENS BERMAN SOBOL SHAPIRO LLP**
301 N. Ave, Suite 902
Pasadena, CA 91101
Telephone: (213) 330-7150
abigailp@hbsslaw.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

*Attorneys for Plaintiffs*